Council, whenever you're ready. Tom Parsons for the Appellant Holy Cross Hospital. May it please the court. A little background. This is what we call in eminent domain a punishment case. That's when an offer is made of $177,000. The offer is rejected by the landowner, and then the case is filed. A new appraiser is found. This is important because when the original offer is made, that's an appraisal that goes through a very There's an administrative review within the federal agency. The offer is made after it's signed off by the chief officer in charge of that department, and the offer is made to the Holy Cross. When Holy Cross says no, it goes to DOJ. DOJ files the case. They hire someone else. This person was paid $40,000. I'll get into that, to do an appraisal on an offer of $120,000. That's why we call it a punishment case. Nogales, a little background. I know it's a backwater. 30,000 people in the area, about 500,000, 600,000 just across the border. Those are big towns in Alaska. Yes. However, through this existing port, this is an expansion of an existing project called the Mariposa Port. Through this port passes $2.1 billion for the produce every year. Sometimes as much as 60% of the produce that comes in during the winter to the United States passes through this port. That's the same amount, roughly, about $2.5 billion that comes in through the San Francisco port. Import. It's a lot. So we have testimony from a witness who's come in and said that the vacant land adjacent to this port that's going to be used for this port is worthless. Finally, why should I ask that you care about this? Why is eminent domain important? We are strange in Tucson. We have the missile site cases. We had 21 missile sites pointed at Russia. A lot of federal condemnation cases there. I-10 that connected the East Coast to LA came through us. We had the Central Arizona project, a $6 billion project lifting water to the thirsty cities of Phoenix and Tucson. We have now the border condemnations. I have four cases. I'm coming right back up to you with the same issue. We just briefed this week. Since the Tennessee ballot, the authority, this is the most federal kind of work. And there's more federal work coming. So I suggest that this is of importance. I guess I'm interested to hear you actually talk about the issues you've raised. But as I read your brief, I mean, they're all just abuse of discretion, evidentiary rulings by the district court. I don't know why. So I'm interested to hear why you think they have this broader impact. Counsel, just if I appreciate Judge Watford focusing. And we're fortunate to have a number of law students with us today. So just to just frame this, this is a case about an eminent domain. And the question is the value of the property. And your appeal involves, I think, a number of evidentiary rulings. And I think Judge Watford's right. They're all abuse of discretion. Is that right? I don't believe that the jury instruction necessarily involves abuse of discretion. But I would say as to two of the other issues, yes, it could be the court's discretion, of course. I mean, I'll be honest with you. I read your brief and just thought on every one of these issues, you've just got an uphill battle. Because the district court has given, I mean, this is a trial that happened, right, a jury trial. The district court has given pretty wide berth in terms of evidentiary rulings. And maybe you can just zero in on what's your best, what's the best or the most egregious error you think the district court committed? All right. You guys are the oracles. What you published, Barabin, comes out last year. Daubert comes out. I was there during the Kumutar argument. What comes out from you is listened to us by us. We study it. We practice it. We teach it at our seminars. And I found myself, and this is a good case in front of these students here, I had a brand new University of Michigan law grad. And he's got to get his first day in the pool. And yes, he did the cross-examination in some of these cases. And I was prohibited from weighing in on some of the objections, which I would have done had I been doing the cross of Mr. Vance and Mr. Harris. I found myself in a fry courtroom. I found myself in a courtroom where 26.1 had no application. It was swept aside. So for the benefit to just translate that, you had a lot of expert witnesses in a courtroom, right? And your concern is that there hadn't been proper discovery going into trial. Absolutely. Under this circumstance, I've got three of the six properties that they're using as comparable sales are within this huge project boundary. And in this day and age, what we have, we have advanced planning that goes on for decades. And when they draw a boundary not around just our Holy Cross 96-acre campus, but a half mile further that are in these environmental statements, and sales go on within that area. Or don't go on. They use both to great effect. They said this land has set fallow since before statehood, before territorial days, since the time of Adam and Eve. This is what they argued. Are you getting to the point that some of those sales were made on condemnation terms? Is that what you're talking about? My point on the sales really is it's a technical term. I'm going to call it the quadruple whammy. The quadruple whammy is present on these sales because of the following. If you draw this boundary for 10 years, if there's a sale between private parties, that makes it suspicious. That's whammy one. If the sale is between a private party and any other government agency with the power of eminent domain, that makes it suspicious. If the sale is between a private party and the government entity that is doing the project itself, that's third whammy. But in this case, we have a sale between ADOT, the Department of Transportation, and the US government, both of whom are doing this project. And you also have testimony in the trial transcript that testified that these sales were voluntary, right? That's it. That's just impossible. These sales, this was a sale between ADOT. And this is the smoking gun. This is called the integra appraisal. Mr. Vance goes out to, at the time he signs his appraisal, I'm independent and I'm- Counsel, we need to hear your strongest argument. You haven't answered Judge Watford's question. So that's what Judge Rothstein's trying to get you to do. OK. It is not voluntary. When the sale is between ADOT, a partner in this project, and the United States government, the other partner in this project, this is border crossing custom houses inspections by both the state and the federal government, when that is based on an appraisal that's up to $6 a square foot, and they take that appraisal, the final purchase price was $2.93 a square foot, but they took the $6, it was a range, $3.50 to $6, they took it and they adjusted it down in an artificial manner, in a false manner, down to $2.93 for this alleged, you know, construction cost. And I'm going to get to that in a second. Mr. Vance takes that number, the adjusted number, $2.93, and then he takes that down to a dollar. I'm going to tell you what I think your strongest argument is and ask you to tell me what the issue is, OK? It seems to me that there's a problem from your briefs. You have several comparables that you think were improperly admitted, right? And to Judge Rothstein's point, some of them you think were improperly admitted because they weren't really arm's length. They're to involve an entity that had condemnation authority. Have I understood that correctly? Yes. OK. There are two Department of Transportation sales, so you just were referring to one of them. Do you mean the one from the hospital to ADOT? There's two from the hospital to ADOT. OK, so can you help us? Which is your strongest argument, sir? Well, my strongest argument involves one of them and that is Mr. Aries, who is called to testify to say the land is worthless. He says, I helped them 10 years ago sell a parcel to the federal government for a dollar a square foot. Right, and that's the one that seems to me to be particularly painful. Absolutely, because the adjoining one is a 273 a square foot, also years before. OK, so for that, for that, if I might, for that sale, because it's from the hospital, so it's a pretty convincing comp for the jury to have heard that, except your argument is, one, that it was really old, about 10 years old, I think. And the second part of the problem is it was to ADOT. Is that right? Yes. OK, so back to Judge Rothstein's point. Her point is she thinks there was evidence in the record that that was a voluntary sale. Could we hear your response, please? We did not know that Mr. Aries was gonna talk about the dollar per square foot sale until it happened at trial, and we asked for a mistrial at that time. That was not disclosed. That was not disclosed. My client, the Minim Sisters, unsophisticated, we have nobody, nobody who could go back 10 years and say, what happened at that? What happened during that case? During the trial, I asked my client, who was present, he had been hired only four years before. He was the most experienced person at the Holy Cross Hospital. And all that he came up with was, you know, we can't look at that sale because they also, they added value by extending a sewer across the property. They extended water lines across the property. It had nothing to do. And Minim Sisters, Minim Sisters are, it's an Ogallis Sonora, before territorial days, established this hospital. When the government comes to you and says, sell us the land, you sell them the land. Have you, I'm just trying to follow whether you've now switched to your concern that Mr. Aries testified to something that was outside the scope of his report. Is that where you are now? Unquestionably, the basis of his report, the opinion, and this thing called the developer's residual report. Okay, so now you have. And if you want my strongest argument, it was the deception of the U.S. District DOJ attorney to induce the court to allow him to testify based on a false representation that, quote, he will not be called to say that the land is worth a dollar a square foot or anything like that. And that's exactly the testimony. What was beyond the scope of his expert report? What was not disclosed? The IHOP sale. IHOP? This original sale to ADOT. Uh-huh. The methodology he would use. Sales come in for two reasons. I just have to backtrack before I finish the answer. Okay. Sales are admitted for two reasons. One, as substantive evidence that the jury can consider in determining just compensation and in support of an expert opinion. It can't be the latter because he had no expert opinion in his deposition or in his report. I'm not gonna expert opinion on just compensation and be avowed from the DOJ. Isn't there a third way that these, that it can come in and that is in response to the testimony of the other party's expert that has already gone on? I don't see how that sale can be used to impeach our expert. If it's disclosed and we wanna say this is substantive evidence of 10 years before, disclose it. Let me have the hearing before the judge why you gotta keep stale sales out or why it's a government sale. Let me have my full Barabin experience or my Dauber experience so that we can address it. But we didn't have it until the moment it was spoken in trial. And that's when I also got that other ADOT appraisal, the Integra appraisal, that was their effort to show that it was all voluntary. Wasn't in advance as a file at the time. And we took his deposition. It wasn't in his report. And then when we read it, we see that it's a smoking gun, that the government's actually appraised it four times what he was testifying the value of that property to be. The appraisal disproved his opinion. This developer's residual approach argument is important to me and I know it doesn't sound important, but it's just counterintuitive for you guys. If you think about buying any raw land, they had the duty to come up with a seller and say, we found a seller who listed his price, his property for $4 a square foot. And the buyer came up and said, you know, it's gonna cost me $4 to develop it. Your land is worthless, but as a gift, I'll give you a dollar a square foot. That's the burden they had to show to get that in. And there is nothing in the record to support that process. It's counterintuitive. The cost is always added to the price of raw land. If you're developing a piece of property, you pay the raw land price, let the sales speak for themselves. Find us raw land parcels around Nogales, the same zoning, find those, let them speak for themselves. They're the evidence. Don't take them and artificially drive them down. And you said that was a prohibited model, a prohibited model in USV 99.66 acres of land. And they did exactly that to us. Council, would you like to reserve some time for rebuttal? Two minutes. Thank you, Your Honors. You bet. We'll hear from opposing council. May I please the court? Kate Foss for the United States of America. As all of you seem to recognize, the issues in this case is all about abuse of discretion. It's about whether Judge Teshima evaluated the evidence in making these evidentiary rulings. And as an additional step, even with an abuse of discretion, they also have to prove that it prejudiced the jury. Here, none of these factors matter. One matter that we look at pretty closely, as you know from the case law, I'm sure from your experience, is allowing an expert to testify to something that's not included in his report. One thing I would like to specifically state is that opposing counsel's testimony that the Mr. Arie's testimony concerning the ADOT sale with Holy Cross was not disclosed is absolutely contrary to the record. If you look at the excerpts of record at 1063 to 64, where you have Mr. Arie's report, it goes into detail about his experience with this prior sale from Holy Cross to ADOT. He was asked about it at his deposition. They never raised the issue of this comparable sale in the motion in limine concerning Mr. Arie's, but did note even in that reply that the fact he's going to testify about it being a dollar per square foot could be a problem. What about the IHOP sale? That's his other argument. He contends that was not included, well, anywhere in pretrial disclosures. The IHOP sale was not contained in pretrial disclosures. That's true. But the IHOP sale wasn't used as a comp in any recognizable sense, and if it had been, it would have only been to Holy Cross's favor at $12 per square foot. Rather, that was discounting the opinion of Hawley, Holy Cross's civil engineer, who said, you don't take into account the net usable square footage when you're considering cost per square foot in development costs. And Mr. Gasolam, who was their real estate broker, who testified, said, no, and no, Gallus, really what you wanna look at is the part of the property that you're actually going to use and not sort of the larger costs when you're considering development. So Mr. Arie's used this IHOP sale as by way of explanation and as rebuttal, in part, to Hawley's testimony that you don't consider the net square footage in just saying that where you've got only a small portion of usable property, somebody's not going to pay the same square footage price for a huge piece of property when they're only going to be using a small portion. And given the topography of Nongalas, this is all irrelevant because you still have to spend considerable money to develop washes and whatnot and avoid these floodplains. And you have to take that into account for the development costs of the entire parcel, even if you only really want a smaller portion. But again, with this IHOP sale, there's nothing to suggest that it prejudiced the jury one way or another, and there's no bearing between the IHOP sale and the ultimate verdict. The opposing counsel's brief spends quite a bit of ink on the fact that in a pretrial hearing, the government specifically said Aries was not going to testify that the property was worth $1 per square foot, and Mr. Aries, of course, did exactly that. So what is your response? What's relevant there is that in the response to the motion of limine, in the oral argument on the motion of limine, the government again and again said, Mr. Aries' testimony is gonna be that this property is worthless, that the cost of development outweigh the marketable use in this property. That was something which was represented. The statement was he's not going to make a before and after valuation. But the government said he's not going to testify that this property is worth $1 per square foot. I am paraphrasing, but not by much. Right. Okay. And that is fair, but his testimony was, again, that it was worthless. That was fully disclosed. But the issue was, in addition, is that Mr. Gastelum, their real estate broker, was asked point blank by Holy Cross, what is your opinion of value on this subject property? And that was never disclosed previously. That was never available.  that Mr. Aries have a chance to rebut that specific statement, which was never before the court. In addition, Mr. Aries wasn't directly asked for an opinion of value. In the context of the testimony, he said, make your best argument for the hospital. If you're their real estate broker, can you get to this $2 figure that Mr. Gastelum had said vacant land goes for in Nogales? And he goes through and he reiterates, as he said it again and again, that this property is worthless. Given the vast amounts of vacant land in Nogales, this is gonna be one of the last pieces of property that they use. And then ultimately comes to the conclusion, well, I guess we'll go for a dollar square foot, because that's what this earlier Holy Cross ADOT sale that I was involved in went for. But that testimony concerning that sale wasn't at issue in the motion to limiting. And the motion to limiting was ultimately mostly focused on the fact that they're saying, Mr. Aries is going to testify about the usability of industrial land. This isn't really industrial land, so it should be excluded as irrelevant and it's going to be cumulative to their appraiser. The context where he's saying, the government's saying, oh, he's not gonna testify to an opinion of value, really wasn't a critical point in terms of the motion to limiting that they were arguing. And there's nothing in the judge's order which indicates that either. You know, Holy Cross' position with regard to the statement is that this court should decide as a matter of law that an equitable doctrine of judicial estoppel, which is used to protect the court,  should be invoked as a matter of law. And that's something which truly is even more than some of these other evidentiary rulings within the discretion of the trial court. Here, the trial court had the information about what statements were made during the motion to limiting presentation, but also was in a position where he could understand sort of the shifting positions and the new information that was given with Mr. Gastelum testifying to an opinion of value where the rebuttal was, and that sort of discretion and considerations of the ongoing trial is one that isn't fixed in stone, but evolves as it goes forward. As another issue, Holy Cross points to this idea of the developer's residual approach. This argument and the case from it was really going to the fact that in that case, there was a paper subdivision, and they said, well, what we're gonna do is we're gonna imagine what this home would, you know, go up for on the open market, multiply it by 10 homes, and then subtract marketing and development costs. That case just stands for the point that the district court was within its discretion to admit entirely speculative information where there was nothing to suggest that there was any sort of market, this price was based on reality whatsoever, and not to say that you can never consider development costs when considering an appraisal. Is it your position that any of the witnesses in this trial use that methodology? It's not our position that any of the witnesses used anything remotely close to that. If anyone, it's possibly Holy Cross's, some of their civil engineers seem to be advocating for approach to that. But Mr. Vance, as an appraiser, was using recognized appraisal standards in looking at topography, in looking at the market conditions at the time of sale, the zoning, all of these adjustments are properly made to comparable sales to get something to be closer to the subject property. Maybe you can address their argument, though, that, I'm sorry, was your expert Vance that was the person saying? Their argument that he should not have been permitted to use as what, three of the five comps, sales involving entities with condemnation authority? Only one of Vance's comp sales was involving an agency with condemnation authority. And though notably, Holy Cross, also one of its comparable sales was to an agency with condemnation authority. What's your best response? Is it just what's good for the goose is good for the gander, or do you have some better response than that? Well, I think notably, Holy Cross also introduced evidence of Vance's comparable sale number one in their case in chief. So under an older rule, they certainly opened the door. But more significantly, the judge considered the voluntariness of the sale during the motion and limine hearing, and considered not only the statements that Holy Cross points out about the voluntary nature of this sale, but also Vance's declaration, the file from ADOT, which he reviewed. He called all of the people in question, asked them about the terms of the sale. Holy Cross also tries to make a point with regard to the appraisal that it was conducted after the sale happened. But if you look at the record, the appraisal was done in May. The ultimate purchase contract was in August of the same year. So there's no issue with that. But the point is that there's not a flat out rule that any case involving an agency with condemnation authority is barred, but a question of voluntariness. Here, there was ample evidence in the record that the case was voluntary. What's the ample evidence of voluntariness? Could you back up and just go through that for us? Sure. With Mr. Vance and his declaration and the materials that he attached in response to the motion limiting, again, he looked through both of the files of all of the agencies. He had conversations with the representatives at ADOT about the terms of the sale. He looked at the appraisal as part of that consideration. And essentially, this was a project between two condemning authorities, and there was no evidence that this was anything other than an arm's length transaction. Holy Cross had the opportunity to cross examine Vance at his deposition and again at trial and found no evidence of the fact that this was anything other than voluntary. This wasn't a conclusory statement as in Transwestern where the landowner said, oh yeah, these are voluntary. Here, the judge had a fair amount of discretion in making these initial gatekeeping determination for what's going to go in front of the jury and what's going to be relevant. Did the hospital put on its own evidence to sort of rebut the claim that the sale was voluntary? No, they did not. They cross examined Vance and had the opportunity to point out that some of these sales that they object to, to suggest they were less than bona fide. But that's also part of the reason why in an abusive discretion standard, they have this opportunity to cross. They have the opportunity to say, hey, you know what, our comps are better than your comps and there's all of these factors going into that. Let me just make sure I understand on the specific sale we're talking about though that Vance used, did I understand you to say that they knew all about that from his deposition and they had time in between the deposition and trial to go do their own investigation? And if they disagreed with his statements about the voluntary nature of it, they could have put that on or crossed him with that evidence, is that? That's correct. Okay. In addition, with the Aries sale that they also point to between Holy Cross and ADOT, certainly Holy Cross is one of the parties in that case has about as good of a record as anyone could to suggest whether or not it was voluntary. In that case, Mr. Aries, with no objection by Holy Cross, testified at length about his involvement in the sale and how that came about. In addition, there was evidence that initially they were interested in a different piece of Holy Cross's land and he acted as broker. He received a commission for that. Holy Cross as the party in the case, if there was anything to suggest that it wasn't voluntary, had the opportunity to do so. The only thing- Did they put in anything on that? They did not. The only thing that Holy Cross objected to was when Mr. Aries was asked to, about the purchase price of that property, not about its voluntary nature. And again, that wasn't any part of the motion limiting concerning Mr. Aries before trial. Why was he allowed to give that answer? I mean, it just, as Judge Christen said, it's pretty, how could the jury not have been influenced by hearing that the very entity that was saying that the property was now worth something much greater, had basically parted with it for a buck a square foot. I mean, that seems pretty damning. Why was he allowed to give that answer? In an appraisal, when you're considering a property, the past history of other sales involving that same property is highly probative of market value, especially when you're in the context where their real estate broker has already been able to testify to an ultimate figure of value. It's just one more piece of evidence for the jury. But the question isn't why is it relevant? We understand clearly why it's relevant. The question is, now you're saying this property was included in his report? This particular one was included in his report? Yes. Anything further? I guess you're out of time. Oh, nothing further. Thank you very much. Yes, we answered that for you, thank you. Counsel, we asked you quite a number of questions, so could you please put two minutes on the clock just to give you a little bit more time? Thank you. Sure. This statute, 42 U.S.C. 4651, has been adopted as a jury instruction on influence, project to influence in the 11th Circuit, and I'm asking this court to do the same. Project influence is all over this case and all over the verdict, and there's no way I could argue at closing. There's no way I could meet the argument that the land had sat fallow since the time immemorial, and there was no way I could meet the three sales in any meaningful way without a jury instruction that allowed me to tell the jury, you will be given information to disregard the effect of the project, and these sales don't exist but for the project. And to say that I'm supposed to go to the federal government, the number one rule in eminent domain is bring real-world practicalities into the courtroom, and this is a $200 million, it's actually a $300 million expansion to the port between these two partners, and to say I'm gonna be able to take a deposition and get the state of Arizona to say I was mistreated when they bought this property, when that federal money is sitting, coming into our district, it would never happen. No official is gonna admit that he was underpaid because of the threat of condemnation. They got 263 a square foot in that sale nonetheless, which is more than 163% higher than what Vance was testifying to. I had the right to attack that in closing. I was denied that right. The burden of proof is on us, the landowner. We're involuntary defendants, but in this strange world of eminent domain, the burden is pushed onto us, and my opponent used Arie's testimony about worthlessness at trial in a way that had no place, no utility at this sport. That was improper. It was not resolved by my right to cross-examine, and could not have been, and I thank you for your time. Thank you both. That will conclude the argument for today. Our court will stand in recess.
judges: Christen, Watford, Rothstein